IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

DWIGHT S. MCKISSICK,            )
                                      )
          Plaintiff,           )
                                      )
   vs.                             )
                                      )
COMMISSIONER OF SOCIAL     )
SECURITY,                   )
                                      )
          Defendant,       )
                                      )

CASE NO. 1:20-CV-01149-JRA

JUDGE JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE

MAGISTRATE JUDGE
JONATHAN D. GREENBERG

**MEMORANDUM OF OPINION AND
ORDER**

Plaintiff, Dwight McKissick ("Plaintiff" or "McKissick"), challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In August and November 2016, McKissick filed applications for POD, DIB, and SSI, alleging a disability onset date of May 15, 2016 and claiming he was disabled due to a back injury.  (Transcript ("Tr.") 15, 68, 78, 89, 111.)  The applications were denied initially and upon reconsideration, and McKissick requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

On November 2, 2018, an ALJ held a hearing, during which McKissick, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 28, 2019, the ALJ issued a written decision finding McKissick was not disabled.  (*Id.* at 15-29.)  The ALJ's decision became final on April 27, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On May 27, 2020, McKissick filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17-18.)  McKissick raises the following issues on appeal:

(1)     Whether the ALJ properly considered the Listings of Impairments as they apply to Mr. McKissick's severe impairments.

(2)     Whether the ALJ's analysis of Mr. McKissick's pain and other limitations was supported by substantial evidence, and whether the ALJ applied the proper legal standards in assessing these subjective limitations.

(Doc. No. 17 at 1.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

McKissick was born in August 1965 and was 53 years-old at the time of his administrative hearing (Tr. 28, 40), making him a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).   He has at least a high school education and is able to communicate in English.  (Tr. 28.)  He has past relevant work as a punch press operator.  (*Id.*)

### B.     Medical Evidence[2]

On June 7, 2016, McKissick went to the Mt. Carmel West emergency room with complaints of increasing pain in his lower back over the past two weeks with burning pain down the back of his right

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Further, since McKissick challenges only the ALJ's findings regarding his physical impairment, the medical evidence discussed is further limited accordingly.

leg. (Tr. 422.) Treatment providers noted McKissick walked into triage. (*Id.* at 419.) McKissick denied leg weakness but reported he had been limping at times. (*Id.* at 422.) McKissick described the pain as moderate to severe and worse with movement. (*Id.*) Associated symptoms included loss of bladder or bowel control. (*Id.*) McKissick denied IV drug use but endorsed tobacco, alcohol, and marijuana use. (*Id.*) McKissick reported using marijuana one to two times a month. (*Id.* at 423.) On examination, treatment providers found movement with no deficits in all extremities, no calf pain or swelling, no edema, and no tenderness over the spinous process or the sacroiliac joint. (*Id.* at 424.) While McKissick had mild tenderness in the right posterior gluteal region, he had no redness, warmth, or swelling. (*Id.*) A straight leg raise test was negative. (*Id.*) McKissick demonstrated 5/5 strength in hip flexion, leg extension, and dorsal and plantar flexion. (*Id.*) Treatment providers found light touch intact in the lower extremities bilaterally, and deep tendon reflexes to be 1+/4 and symmetrical in the patella and ankle. (*Id.*) Treatment providers diagnosed McKissick with acute lumbar pack pain and acute sciatica on the right and prescribed a five-day course of prednisone and a five-day prescription for Norco. (*Id.*) McKissick was also given a referral to a family practice or orthopedic clinic. (*Id.*)

On June 9, 2016, McKissick returned to the Mt. Carmel West emergency room complaining of nausea and vomiting from the Norco he had been prescribed. (*Id.* at 448.) Treatment providers noted McKissick walked to the exam room with a slightly antalgic gait on the right and that his history and examination was consistent with sciatica. (*Id.*) Treatment providers prescribed Percocet and sent him home. (*Id.*) McKissick stated he planned to contact a physician from the referral list he had been provided to establish care. (*Id.*)

On June 15, 2016, McKissick again returned to the Mt. Carmel West emergency room complaining of back pain that was a 10/10. (*Id.* at 464.) McKissick reported he had run out of pain medication and was requesting another pain prescription. (*Id.*) He had not yet contacted a primary care

physician.  (*Id.*)  On examination, Dr. Steven Gentile found tenderness to palpation over the right lower back musculature, but no cervical, thoracic, or lumbar sacral tenderness.  (*Id.* at 466.)  Dr. Gentile found 5/5 strength for flexion and extension of the lower extremities bilaterally, sensation was grossly intact in the lower extremities bilaterally, a straight leg raise test was negative, and there was no foot drop.  (*Id.*) Dr. Gentile noted:

> This is the patient's third visit to the ER in the last 8 days for similar complaint. Patient is requesting Percocet. Patient denies any bowel or bladder incontinence. Patient appears to ambulate without difficulty. Patient reports pain in his right lower back that radiates into his right lower extremity. Patient's exam is benign. . . . He does report that he recently moved to Columbus from Cleveland Ohio, he has been told at both previous visits to follow-up with a family physician, he has not done so and claims that he "lost his phone." OARRS report was obtained and the patient has had two prescriptions in the past 8 days for narcotics. I did not feel comfortable scribe and [sic] this patient any additional narcotic pain medication. I did discuss with the patient that we control his pain with prednisone and prescription for Flexeril. I did discuss with the patient that is not appropriate to come to the ER to control chronic pain and he needed to follow-up with her family physician for outpatient therapy. . . . I am concern [sic] for drug-seeking behavior[.]

(*Id.*)

On June 27, 2016, McKissick saw Shengyi J. Mao, M.D., to establish care.  (*Id.* at 503.) McKissick complained of back pain for the past six weeks.  (*Id.*)  McKissick reported using illegal drugs, including marijuana.  (*Id.* at 504.)  McKissick told Dr. Mao he had been recently laid off from his job driving a forklift because of his back pain.  (*Id.*)  Dr. Mao noted McKissick appeared uncomfortable and in pain.  (*Id.*)  On examination, Dr. Mao found no tenderness over the midline spine or paraspinals but intense pain over the right parasacral area near the sacroiliac join and down to the right buttocks and posterior thigh.  (*Id.* at 505.)  Dr. Mao noted McKissick walked with a limp, favoring his right leg, with some foot drop.  (*Id.*)  Dr. Mao found decreased reflexes on the right knee and ankle, decreased sensation over the right anterior foot, and decreased strength with right foot dorsiflexion.  (*Id.*)  Dr. Mao found normal strength with right foot plantar flexion and of the left foot.  (*Id.*)  McKissick told Dr. Mao he could

not walk.  (*Id.*)  Dr. Mao noted McKissick had "significant weakness of leg" and "significant pain on exam," so he ordered a lumbar/sacral MRI and prescribed a short course of Percocet.  (*Id.*)  Dr. Mao started McKissick on Gabapentin and discussed starting physical therapy after the MRI.  (*Id.*)

A July 18, 2016 MRI of the lumbar spine revealed "L4-L5 right paracentral/subarticular extrusion occupying the right lateral recess resulting in partial effacement of the thecal sac, severe right and mild to moderate left neuroforaminal narrowing, and moderate spinal canal stenosis," as well as "[m]ultilevel lumbar spondylosis as described above, contributing to neuroforaminal narrowing most prominent at the L5-S1 level without significant spinal canal stenosis."  (*Id.* at 507-09.)

On August 22, 2016, McKissick saw Dr. Mao for follow up.  (*Id.* at 515.)  McKissick reported his pain had improved after the last visit but got worse again after he ran out of Percocet.  (*Id.*)  McKissick told Dr. Mao he had started working again packing dog food until he ran out of Percocet and his pain came back.  (*Id.* at 516.)  On examination, Dr. Mao found no tenderness over the midline spine or paraspinals but intense pain over the right parasacral area near the sacroiliac join and down to the right buttocks and posterior thigh.  (*Id.* at 517.)  Dr. Mao noted McKissick walked with a limp, favoring his right leg, with some foot drop.  (*Id.*)  Dr. Mao found decreased reflexes on the right knee and ankle, decreased sensation over the right anterior foot, and decreased strength with right foot dorsiflexion.  (*Id.*)  Dr. Mao found normal strength with right foot plantar flexion and of the left foot.  (*Id.*)  McKissick demonstrated 4/5 strength with right hip flexion.  (*Id.*)  Dr. Mao noted no concerning findings regarding McKissick's OARRS report.  (*Id.*)  McKissick reported he saw the spine center, which recommended surgery; McKissick was "strongly considering" surgery and was to return next week.  (*Id.*)  Dr. Mao noted Gabapentin had helped, but McKissick skipped doses at times because of drowsiness.  (*Id.*)  McKissick also took ibuprofen but used Percocet for severe pain.  (*Id.*)  Dr. Mao noted McKissick still needed to take "increased breaks" and was working with a temp agency.  (*Id.*)

5

On October 19, 2016, McKissick saw Dr. Mao for follow up. (*Id.* at 520.) McKissick reported his pain was "ok" and "controlled" with his current medications, although he experienced "worsening pain off and on" and was still limited in his ability to work because of his pain. (*Id.*) McKissick told Dr. Mao he had worked for a week and then needed to take the next week off because of his pain. (*Id.*) McKissick reported missing his scheduled back surgery because he had been evicted from his apartment and his eviction hearing had been set for the same day. (*Id.*) McKissick had not yet rescheduled his surgery. (*Id.*) On examination, Dr. Mao found McKissick's condition unchanged from his August 22, 2016 examination. (*Id.* at 522.) Dr. Mao noted McKissick tried to work "occasionally" but had a hard time keeping a regular job because of his pain, which led to his eviction. (*Id.* at 523.) Dr. Mao continued Gabapentin, ibuprofen, and Percocet, and encouraged McKissick to reschedule his back surgery. (*Id.*)

On December 12, 2016, McKissick saw Dr. Stephanus Viljoen for follow up. (*Id.* at 556.) McKissick reported his pain was an 8/10 at all times and he thought his foot drop was slightly worse. (*Id.*) On examination, Dr. Viljoen found good strength in the iliopsoas, quadriceps, and hamstrings bilaterally, a positive straight leg raise on the right, and ankle dorsiflexion at 4+/5. (*Id.*) Dr. Viljoen noted McKissick could toe walk, although he had difficulty with heel walking on the right. (*Id.*)

On January 17, 2017, McKissick underwent a hemilaminectomy and discectomy. (*Id.* at 536.) The next day, Gwendolin Earhart, RN, wrote:

> Reviewed AVS and prescriptions with patient. Patient focusing on amount of percocet prescribed and not paying attention to details of self care/home care. Pt. said "I will just read it later[.]" I continued to attempt to review AVS highlighting restrictions and s/s of infection. Pt continues to voice feelings of anger that he is not given 90 day supply of percocet. Support given and reminded pt of Dr. Viljoen f/u appt on 1/30. Pt request [sic] to speak to MD via phone. Pt spoke to Dr. Hatef.

(*Id.* at 545.)

On January 30, 2017, McKissick saw Dr. Viljoen for follow up. (*Id.* at 530.) McKissick reported his leg pain and leg strength were better, although he continued to have some back pain. (*Id.*) Dr. Viljoen

6

noted McKissick "was on a significant amount of narcotic medications before surgery, and he has been having problems weaning off this." (*Id.*) On examination, Dr. Viljoen found good strength of the lower extremities, better strength in right ankle dorsiflexion, and no erythema of the incision on McKissick's back. (*Id.*) Dr. Viljoen stated he would give McKissick a one-time refill for pain medication but made it clear that he would not prescribe a refill after that, and McKissick should wean himself off the pain medication over the next four weeks. (*Id.*)

On March 27, 2017, McKissick saw Xiaogang Jiang, M.D., at the Cleveland Clinic Pain Management Center for evaluation of his low back pain. (*Id.* at 586-87.) McKissick reported his leg pain and foot drop had improved after his January surgery but his low back pain remained. (*Id.* at 587.) McKissick rated his pain as 10/10 and described it as burning, sharp, and tingling. (*Id.*) McKissick told Dr. Jiang his pain interfered with physical activity, work, walking, sitting, driving, cleaning, and lifting. (*Id.*) Sitting, forward flexion, lifting, lying down, and walking exacerbated his pain, while medication and heat alleviated it. (*Id.*) McKissick reported he was there for pain medication because his physician did not prescribe it. (*Id.*) Dr. Jiang noted McKissick used marijuana regularly. (*Id.*) On examination, Dr. Jiang found a positive seated straight leg raise on the right, swelling and "severe tenderness" around the surgical incision, severe tenderness of the paraspinal muscles at the same level, and a pain-limited range of motion of the lumbar spine. (*Id.* at 588.) McKissick demonstrated full peripheral joint range of motion in all four extremities. (*Id.*) While Dr. Jiang noted reduced muscle strength in all groups in the right lower extremity, he found "signs of lack of full efforts"; there was no atrophy, tone abnormalities, or loss of sensation. (*Id.*) McKissick walked with an antalgic gait, favoring the right leg. (*Id.*) Dr. Jiang wrote:

> He presents today for "pain meds". ORRAS report shows he have [sic] been receiving Percocet or Oxycodone from multiple providers since June 2016. He is homeless and currently sleeps in a couch in his friend's house. He uses marijuana regularly. We do not recommend opioids for long term use for chronic pain, particularly for patients who use illicit drugs. There is still edema but no signs of infection in the surgical site.

7

> We recommend Medrol Dose pak and Diclofenac gel. We also recommend patient to follow up with Dr. Viljogen for reassessment. Patient insists that Percocet is the only thing helps [sic], and he needs to see someone else who can prescribe him Percocet. Counseling regarding the risks of opioids treatment was provided. Prescriptions for Medrol Dose pack and Diclofenac gel were given.

(*Id.* at 589.)

On June 19, 2017, McKissick saw Jijun Xu, M.D., Ph.D., for follow up regarding his back pain. (*Id.* at 615.) McKissick reported he had not followed up with Dr. Viljoen and the Medrol Dospak had not provided much pain relief. (*Id.*) McKissick complained of persistent back pain that he rated as a 9/10. (*Id.*) McKissick reported walking, especially walking up stairs, made his pain worse, while lying down and Percocet alleviated it. (*Id.*) On examination, Dr. Xu found a well healed surgical incision with no edema, positive straight leg on the right while sitting and supine, pain to palpation over the lumbar spine, reduced range of motion in the back due to pain, full and pain free movement of the peripheral joints in all four extremities without obvious instability or laxity, positive severe tenderness over the right sacroiliac joint, positive Patrick test on the right side for sacroiliac joint pain, upper and lower extremity strength 4/5 bilaterally except for right ankle dorsiflexion and plantar flexion, and no atrophy or tone abnormalities. (*Id.* at 617.) Dr. Xu noted:

> Postoperatively his leg pain and foot drop improved remarkably but he continuously has severe low back pain *with muscle tightness and feels like "Charles horses" particularly during the night sleep*. He uses marijuana regularly. At last visit we recommend [sic] Medrol Dospak for edema around the incision. The edema has resolved but patient still complains of pain. He reports that his right foot drop is worsening when he walk [sic] for a long distance, and he had muscle spasm in right lower extremity at night. Physical exam revealed evidence for right SI joint arthropathy. Patient requests for opioids. We emphasize again the [sic] we do not recommend opioids for chronic non-cancer pain. We recommend increasing the dose of gabapentin, adding muscle relaxant Zanaflex at *bedtime for night pain associated with muscle tightness and "Charles horses".,* [sic], and schedule for right SI joint injection.

(*Id.*) (emphasis in original).

8

On September 5, 2017, McKissick saw Schirron Campbell, PA-C, PA, for follow up.  (*Id.* at 651.) McKissick reported since his last visit his pain had been worsening.  (*Id.*)  McKissick rated his pain as a 10/10 and reported taking 300 mg of Gabapentin two to three times a day.  (*Id.*)  McKissick told Campbell Percocet mitigated his pain.  (*Id.*)  Campbell's review of the OARRs report showed "multiple recent short scripts for percocet from dentist and Emergency Department."  (*Id.* at 652.)  On examination, Campbell found tenderness to palpation in the mid low back, pain to palpation over the lumbar spine and paraspinous muscles, limited range of motion due to pain, positive FABER test on the right, full range of motion in without pain, obvious instability, or laxity in the peripheral joints of all four extremities, 3/4 strength in the right lower extremity, and right foot drop.  (*Id.* at 653.)  Campbell noted McKissick's gait was steady without an assistive device.  (*Id.*)  Dr. Xu ordered an MRI of the low back.  (*Id.*)  Campbell noted McKissick again requested Percocet.  (*Id.*)  Campbell reiterated they did not recommend opioid therapy for McKissick's pain and would not write for that medication.  (*Id.*)

A September 13, 2017 MRI revealed "[s]evere neural foraminal stenosis on the right at L4/L5 and on the left at L5/S1 related to degenerative and other changes," as well as "[d]egenerative disc changes most pronounced at L5/S1."  (*Id.* at 657.)

On September 15, 2017, McKissick saw Dorothy Bradford, M.D., for a consultative physical examination.  (*Id.* at 610.)  On examination, McKissick had 3/5 strength in the right lower extremity, no muscle atrophy, normal range of motion of the cervical spine, and reduced range of motion of the dorsolumbar spine and right hip, knee, and ankle.  (*Id.* at 606-09.)  Dr. Bradford noted McKissick reported he took no medications.  (*Id.* at 610.)  On examination, Dr. Bradford found no tenderness in the thorax and back but decreased range of motion due to pain and absent touch sensation at the right lateral calf.  (*Id.* at 611-12.)  Dr. Bradford noted McKissick had a "steppage gait" and used a cane on his left "for support and fall prevention."  (*Id.* at 612.)  Dr. Bradford opined:

9

> In my medical opinion claimant's allegation is supported by this clinical exam and medical records dated 1/30/17 from University Hospital. Claimant has a complete right foot drop due to lumbar disc disease. He uses a nonobligatory cane for support and fall prevention. He is a fall risk on an uneven surface.

(*Id.*)

A lumbar spine x-ray series taken that same day revealed mild arthritis and possible distal stenosis. (*Id.* at 613.)

On September 18, 2017, McKissick saw Dr. Xu for follow up.  (*Id.* at 660.)  McKissick reported his pain had been persistent and getting worse.  (*Id.*)  McKissick told Dr. Xu standing, lifting, and walking aggravated his pain, while sitting, lying down, and medications alleviated it.  (*Id.*)  McKissick rated his current back pain as a 7/10.  (*Id.*)  On examination, Dr. Xu found tenderness to palpation over the lumbar spine, pain with flexion and extension of the lumbar spine, difficulty going from standing to sitting, and limited range of motion with forward flexion, backward extension, lateral bending to the left and right, and rotation to the left and right.  (*Id.* at 662-63.)  Dr. Xu determined McKissick had normal motor strength, tone, and sensation throughout.  (*Id.* at 663.)  Dr. Xu noted McKissick walked with a cane.  (*Id.*)  Dr. Xu increased Neurontin, started McKissick on physical therapy and a small dose of Percocet, and scheduled a right L4 TFES injection.  (*Id.*)  Dr. Xu advised McKissick the Percocet was not a long-term plan. (*Id.*)

On October 17, 2017, McKissick saw PA-C Campbell for follow up.  (*Id.* at 672.)  McKissick reported his pain was worse and rated it as a 10/10.  (*Id.*)  Campbell noted McKissick was taking Gabapentin at an increasing amount, but it was "unclear how he is taking this medication."  (*Id.*)  Campbell reviewed a urinalysis tox screen from September 18, 2017 and found it to be positive for cannabinoid and absent for the Percocet he had been prescribed.  (*Id.* at 673.)  Campbell reviewed McKissick's OARRS report and noted it showed "multiple recent short scripts for Percocet from dentist and Emergency Department."  (*Id.*)  Campbell further noted, "Not received after receiving script for

10

Percocet from PMC on 9/18/2017. Patient received a fill for an older script of Gabapentin also prescribed by PMC instead of the increased amount prescribed on 9/18/2017." (*Id.*)

On examination, Campbell found no atrophy or tone abnormalities, tenderness to palpation over the mid-low back, pain to palpation over the lumbar spine and paraspinous muscles, limited range of motion in the back due to pain, positive FABER test on the right, pain free and full range of motion in the peripheral joints in all four extremities without obvious instability or laxity, and 3/4 strength in the right lower extremity with right foot drop. (*Id.* at 674-75.) McKissick had a steady gait without an assistive device. (*Id.* at 675.) Campbell noted that since McKissick's urinalysis results violated clinic policy, he would be weaned from opioid therapy. (*Id.*) In addition, McKissick's insurance had denied the steroid injection without a prior course of physical therapy, so Campbell prescribed ibuprofen and ordered physical therapy. (*Id.*) Campbell encouraged McKissick to take 600 mg of Gabapentin as previously prescribed. (*Id.*)

On December 4, 2017, McKissick saw Dr. Xu for follow up. (*Id.* at 678.) Dr. Xu noted since McKissick's last visit, he had weaned off Percocet and was having increased pain. (*Id.*) McKissick reported Gabapentin was only "mildly helping" and had only completed one session of physical therapy because of a recent fall. (*Id.*) On examination, Dr. Xu found tenderness to palpation over the lumbar spine right lumbar facets, and right lumbar paraspinal muscles, positive straight leg raise test on the right at 40 degrees, pain with flexion of the lumbar spine, difficulty going from standing to setting, tenderness over the right sacroiliac joint, and positive Patrick's sign on the right. (*Id.* at 680.) Dr. Xu further found normal extremities, with 4/5 strength of the right lower extremity and 5/5 strength of the left lower extremity. (*Id.* at 681.) Dr. Xu noted McKissick had an antalgic gait and used a cane. (*Id.*) Dr. Xu continued Gabapentin, ibuprofen, and Xanaflex, and started McKissick on Elavil. (*Id.*) Dr. Xu noted McKissick had been weaned off Percocet as a result of an "inconsistent pain panel." (*Id.*) Dr. Xu ordered

an orthotics consult for a foot brace since McKissick had recently fallen while walking because of foot drop.  (*Id.*)

On February 9, 2018, McKissick saw Dr. Xu for follow up.  (*Id.* at 686.)  McKissick reported persistent, stable low back pain that he rated as a 7/10.  (*Id.*)  Walking and stretching aggravated his pain, while lying down and medications alleviated it.  (*Id.*)  On examination, Dr. Xu found pain to palpation over the lumbar spine, normal range of motion in the back with pain reproduction, full and pain free range of motion in the peripheral joints without obvious instability or laxity in all four extremities, pain and cramping with movement of the foot, normal upper and lower extremity strength bilaterally, and an antalgic gait.  (*Id.* at 688.)  McKissick reported orthotics helped with his foot drop.  (*Id.*)  Dr. Xu noted McKissick had completed physical therapy, but his pain persisted, so McKissick wanted to proceed with an L5 TFESI.  (*Id.*)

On March 26, 2018, McKissick underwent a right transforaminal epidural steroid injection.  (*Id.* at 696.)

On May 14, 2018, McKissick saw PA-C Campbell for follow up.  (*Id.* at 700.)  McKissick reported his pain had been worsening since his last visit.  (*Id.*)  McKissick rated his pain at an 8.5/10.  (*Id.*)  McKissick reported standing, sitting, forward flexion, lying down, and walking exacerbated his pain, while Percocet alleviated it.  (*Id.*)  Campbell noted a review of McKissick's OARRS report showed "multiple recent short scripts for Percocet from dentist and Emergency Department."  (*Id.* at 701.)  On examination, Campbell found tenderness to palpation of the mid low back and pain to palpation over the lumbar spine and paraspinous muscles, limited range of motion of the back due to pain, and positive FABER test on the right.  (*Id.* at 702.)  Campbell noted full range of motion of the peripheral joints without obvious laxity or instability in all four extremities.  (*Id.*)  Campbell found 3/4 strength in the right lower extremity, right foot drop, and antalgic gait.  (*Id.* at 703.)  Campbell noted McKissick used a cane

when walking.  (*Id.*)  McKissick reported less than 50% pain relief from the steroid injection for about three weeks before his pain returned to previous levels and maybe even got worse.  (*Id.*)  McKissick stated he did not feel his medication was helping and again requested Percocet.  (*Id.*)  After discussing with Dr. Xu, Campbell denied McKissick's request.  (*Id.*)

## C.    State Agency Reports

On February 22, 2017, Rannie Amiri, M.D., found there was insufficient evidence to evaluate McKissick's claim.  (*Id.* at 74, 84.)  Dr. Amiri explained, "Without clarification from clmt regarding current functional status and determination if he has proceeded with or had surgery, evidence is insufficient to evaluate present severity of clmt's impairment."  (*Id.*)

On September 25, 2017, David Knierim, M.D., on reconsideration found McKissick could occasionally and/or carry 20 pounds, frequently lift and/or carry 10 pounds, he could stand and walk for about six hours in an eight-hour work day, he needed a medically required hand-held device for walking, and he could sit for about six hours in an eight-hour workday.  (*Id.* at 102-03, 124-25.)  McKissick could occasionally push and/or pull with his right lower extremity due to foot drop and generalized weakness. (*Id.* at 102, 124.)  He could never climb ladders, ropes, or scaffolds, but he could frequently climb ramps and stairs.  (*Id.*)  McKissick's ability to balance was unlimited.  (*Id.*)  He could frequently stoop, kneel, and crouch, and could occasionally crawl.  (*Id.*)  Dr. Knierim noted McKissick used a cane for balance, on uneven surfaces, and for distances greater than 50 feet.  (*Id.* at 103, 125.)  McKissick must avoid all exposure to hazards.  (*Id.*)

## D.    Hearing Testimony

During the November 2, 2018 hearing, McKissick testified to the following:

- He lives with a friend in an apartment, and the apartment building has an elevator. (Tr. 39-40.)  The laundry is right down the hall.  (*Id.* at 39.)  His friend lets him stay at her apartment.  (*Id.* at 40.) He does not have a driver's license and does not drive.  (*Id.* at 41.)  He stopped having a license after he got some tickets he could not pay.  (*Id.*)

13

He used to get SSI in 1992, but after going to prison he never signed back up for it again because he wanted to work.  (*Id.* at 41-42.)  He thought he signed up for SSI again, and thought he was denied.  (*Id.* at 42.)  The last time he was in prison was 2002 to 2007.  (*Id.*)

- He worked as a punch press operator at Tri-Weld Enterprises for about two years.  (*Id.* at 45.)  He was terminated from that job.  (*Id.*)

- He cannot work because of his back.  (*Id.* at 48.)  He tried to work, but it took him three days to recover from every day he worked.  (*Id.*)  He was okay until his back went out, but then it took too long for him to recover and then his medications made him too sleepy to work.  (*Id.*)  His back has gotten worse since his surgery.  (*Id.*)  He should not have had the surgery, but he was in so much pain he had to undergo surgery.  (*Id.*)

- He takes medication for his back, and he has received two back injections.  (*Id.* at 49.)  The injections do not help his back.  (*Id.* at 54.)  The first injection lasted for a week and the second lasted for about two weeks.  (*Id.*)  After that, it was like the injections never happened.  (*Id.*)  He had to take his medications on top of the injections.  (*Id.*)  He has done physical therapy.  (*Id.* at 55.)  His back pain radiates into his right leg.  (*Id.* at 58.)  He wears a brace on his right foot for his drop foot.  (*Id.*)  It helps a little bit.  (*Id.* at 59.)

- He can stand up and wash his own dishes.  (*Id.* at 51.)  He has a hard time bathing and has to be careful getting in and out of the tub.  (*Id.*)  He always worries about falling.  (*Id.*)  He has fallen a few times in the past couple of years.  (*Id.*)  He uses a cane to keep himself from falling.  (*Id.*)  He can cook and do his own laundry.  (*Id.* at 52.)  He does not do much cleaning, although he could maybe clean the sink.  (*Id.*)  He spends a typical day watching TV and movies all day and talking to his mother and sisters on the phone.  (*Id.*)  The friend he lives with is on disability.  (*Id.*)  She does not have a condition where he needs to help her or take care of her, although a few times she has had a seizure and he has had to call 911.  (*Id.* at 52-53.)  He does not stay at her apartment all the time.  (*Id.* at 53.)  He stays at different people's houses.  (*Id.*)  His friend lets his mail be sent there, and he stays there one or two days a week.  (*Id.*)

- He cannot walk without his cane because of his foot drop.  (*Id.* at 55.)  He cannot sit through a whole movie.  (*Id.* at 56.)  He gets up about six times in an hour.  (*Id.*)  The most comfortable position for him is laying down on his back.  (*Id.*)  He is only pain free laying on his back for about 15 minutes.  (*Id.*)  He takes Gabapentin for his pain.  (*Id.*)  It does not help because he has to keep going back for the shots.  (*Id.* at 57.)  Gabapentin makes him drowsy.  (*Id.*)  His pain level is a 10/10 without Gabapentin; with Gabapentin, it's a 7/10.  (*Id.* at 61.)  When he took Percocet, it took his pain away, but he still did not do anything but sleep.  (*Id.*)

- He can sit for 10 to 15 minutes before he needs to stand up.  (*Id.* at 59.)  He can stand for about ten minutes before he needs to sit back down.  (*Id.* at 60.)  He can walk two

houses down with his cane before he turns around. (*Id.*) He could walk further on medication, but not too much further because Gabapentin makes him tired. (*Id.* at 61.)

• He last used marijuana a few months ago. (*Id.* at 62.)

The VE testified McKissick had past work as a punch press operator. (*Id.* at 64.) The ALJ then posed the following hypothetical question:

> Mr. Nimberger, I want to ask if you can please assume an individual of the claimant's age, education and work experience, and if you can please assume that this hypothetical individual can perform the full range of light work with the following additional limitations. This individual can occasionally push and pull with the right lower extremity. This individual can frequently climb ramps and stairs; never climb ladders, ropes and scaffolds. This individual can frequently stoop, kneel and crouch but occasionally crawl. This individual should never be exposed to hazards, such as unprotected heights and dangerous machinery. In addition, this individual is limited to perform simple, routine tasks; have occasional interactions with supervisors, coworkers and the public; and is also limited to routine workplace changes. With these limitations, can you please advise, would such an individual be able to perform the claimant's past work?

(*Id.*)

The VE testified the hypothetical individual would not be able to perform McKissick's past work as a punch press operator. (*Id.*) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as office cleaner, packager, and wireworker. (*Id.* at 64-65.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

15

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).    Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f)416., 920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, McKissick was insured on his alleged disability onset date, May 15, 2016, and remained insured through December 31, 2019, his date last insured ("DLI.") (*Id.* at 15.) Therefore, in order to be entitled to POD and DIB, McKissick must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.    The claimant has not engaged in substantial gainful activity since May 15, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease and schizophrenia spectrum and other psychotic disorders (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with lifting and carrying twenty pounds occasionally and ten pounds frequently. The claimant is able to stand and/or walk six hours in an eight-hour workday and sit for six hours in an eight-hour workday with occasional pushing and pulling with the right lower extremity. The claimant is limited to frequent climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, occasional crawling, and frequent stooping, kneeling, and crouching with no exposure to hazards such as unprotected heights and dangerous machinery. The claimant is further limited to performing simple, routine tasks in a work environment with only routine workplace changes and occasional interaction with supervisors, coworkers, and the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August **, 1965 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in the significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from May 15, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-29.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  Whether the ALJ Properly Considered Listing 1.04(C)

McKissick argues the ALJ failed to analyze whether he met or equaled Listing 1.04(C).  (Doc. No. 17 at 14.)  McKissick asserts that while his impairment "may not render him completely unable to ambulate, an analysis of 1.04(C) is necessary in a proper analysis of Mr. McKissick's limitations."  (*Id.* at 14-15.)  McKissick argues that "[a] careful review of the record demonstrates that Mr. McKissick was, in fact, unable to ambulate effectively" as defined in the introduction to Listing 1.04.  (*Id.* at 15.)  McKissick maintains "a proper consideration of not just 1.04(A) but 1.04(C) is necessary to a proper evaluation of this claim," and the ALJ's failure to do so was error.  (*Id.* at 16.)

The Commissioner responds that "the ALJ explicitly found that the record did not support that Plaintiff could not ambulate effectively, the determinative factor for whether he met Listing 1.04(C), and therefore Plaintiff did not meet or equal listing 1.04(C)."  (Doc. No. 18 at 6-7.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.920(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

20

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *16 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416.

Moreover, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner." *Lett*, 2015 WL 853425, at *16. *See also Ford v. Comm'r of Soc. Sec.*, No. 13-CV-14478, 2015 WL 1119962, at *17 (E.D. Mich. March 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.*, No. 1:12-CV-2313, 2013 WL 6634300, at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011).

Here, the ALJ provided the following discussion regarding McKissick's physical impairment at Step Three:

> The severity of the claimant's physical impairment does not meet or medically equal the criteria of any listing in section 1.04 (disorders of the spine) or any other section in 20 CPR Part 404, Subpart P, Appendix 1. There is no evidence of nerve root compression, spinal arachnoiditis, *or lumbar spinal stenosis resulting in an inability to ambulate effectively as required to meet listing 1.04*. In her brief, the claimant's representative argued that the claimant meets or medically equals section 1.04A because of symptoms consistent with nerve root compression (Exhibit 16E/5). However, imaging studies do not mention any indication of nerve root compression (e.g. Exhibits 6F/13 and 13F/43). Therefore, the claimant does not meet listing 1.04A. Additionally, no medical expert has opined the claimant medically equals any listing. Therefore, the severity of the claimant's physical impairment does not meet or medically equal the criteria of any listing in 20 CPR Part 404, Subpart P, Appendix 1.

(Tr. 18) (emphasis added).

The ALJ then provided a more detailed review of the medical evidence relating to McKissick's back problems in her RFC analysis.  (*Id.* at 21-27.)  This recitation of the evidence included a thorough review of the diagnostic testing, treatment notes, and examination findings relating to McKissick's back impairments.  (*Id.*)  The ALJ specifically considered the following medical evidence:

- During an emergency room visit, McKissick walked to the exam room with only a slightly antalgic gait.

- The following week, treatment providers noted he appeared to walk without difficulty and his examination was benign.

- While he had a limp favoring the right leg with some foot drop, he had a normal range of motion.

- He could toe walk, although he had trouble heel walking on the right side.

- At a February 2017 evaluation, his gait was normal, although he used a cane.

- The consultative examiner noted he used a non-obligatory cane.

- He could walk, although he used a cane.

- He had normal strength of the extremities bilaterally, although he had an antalgic gait.

22

- In July 2016, he started a new job packing dog food while on pain medication.

- In November 2016, he began working in construction.

- In April 2017, he got into a physical altercation.

- In August 2017, he reported he could do his own shopping and prepare easy meals.

- In September 2017, he reported he performed odd jobs in lieu of payment at a boarding house where he was staying.

- At the hearing, he testified he could wash dishes and do laundry.

- He "generally maintained at least fair strength throughout the record with most of his treatment notes indicating that his strength was slightly reduced, yet still considered good, or normal."

(*Id.*)

First, McKissick's argument is not well-taken; as the ALJ noted in her Step Three analysis, counsel argued in her pre-hearing brief that Listing 1.04(A) "most closely matches Mr. McKissick's impairments." (*Id.* at 292.) Even here on judicial review, McKissick does not clearly argue he meets or equals Listing 1.04(C); rather, he asserts that while "his condition may not render him completely unable to ambulate, an analysis of 1.04(C) is necessary." (Doc. No. 17 at 14-15.) The ALJ explicitly discussed all three subparts of the Listing at Step Three. (Tr. 18.)

Furthermore, the Court finds substantial evidence supports the ALJ's conclusion McKissick does not meet the requirements of Listing 1.04. Listing 1.04 governs disorders of the spine and requires the spinal condition result "in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. Additionally, there must be:

> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, *and resulting in inability to ambulate effectively*, as defined in 1.00B2b.

§ 1.04(C) (emphasis added). Listing 1.00(B)(1)(b)(1) defines an inability to ambulate effectively as meaning "having insufficient lower extremity functioning to permit independent ambulation without the

use of a hand-held assistive device(s) that limits the functioning of both upper extremities." In his brief, McKissick glosses over this definition and instead focuses on select portions of Listing 1.00(B)(1)(b)(2) (Doc. No. 17 at 15), which states:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

In support of his argument, McKissick points to: (1) medical evidence showing a limp, right foot drop, and that he used a cane for support; (2) Dr. Bradford's "note[]" that he was a fall risk on uneven surfaces; (3) "significant weakness and decreased range of motion of the right leg and ankle"; (4) McKissick's reports that his back pain was worsened with walking; and (5) McKissick's testimony that he could only walk the length of four houses with his cane while taking Gabapentin. ((Doc. No. 17 at 15.)

With respect to the treatment records, while McKissick points to medical evidence be believes supports a more restrictive RFC, the evidence is mixed, and the ALJ credited the medical evidence that supported the RFC. McKissick makes no argument that the ALJ ignored or overlooked contrary lines of evidence in the record. (Doc. No. 17.) It is the ALJ's responsibility to resolve conflicts in the evidence, and it is not for the Court to reweigh the evidence. While the Court acknowledges there is evidence in the record that supports McKissick's argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.

24

Regarding Dr. Bradford's notation that McKissick was a fall risk, the ALJ assigned her opinion little weight (Tr. 27), a finding McKissick does not challenge on appeal.  (Doc. No. 17.)  Furthermore, the ALJ considered Dr. Bradford's notation that McKissick was a fall risk and found as follows:

> Dr. Bradford opined that the claimant was a fall risk on uneven surfaces (Exhibit 11F/8). . . .While Dr. Bradford's opinion relating to ambulation may be supported by the record, there is no indication as to any other physical restrictions, including exertional limitations, that the claimant may require.

(Tr. 27.)  McKissick makes no argument with respect to the ALJ's findings regarding Dr. Bradford's opinion.  (Doc. No. 17.)

Finally, as discussed in more detail below, the ALJ was not required to credit McKissick's subjective statements regarding his pain and his estimation of how far he could walk with his cane.

As the Sixth Circuit has explained:

> [A claimant] must do more than show that the ALJ's decision leaves open the question whether he meets [a] listing . . . he must show that the open question is a *substantial* one that justifies a remand.  *Abbott*, 905 F.2d at 925.  He has not done so.
>
> ***
>
> A substantial question about whether a claimant meets a listing requires more than what Sheeks has put forth here, a mere toehold in the record on an essential element of the listing.

*Sheeks v. Colvin*, 544 F. App'x 639, 641-42 (6th Cir. 2013).  Here, the ALJ mentioned and discussed Listing 1.04(C) in her analysis at Step Three.  McKissick must do more than establish "a mere toehold in the record on an essential element" of Listing 1.04 to warrant a remand, and he fails to do so here.  Substantial evidence supports the ALJ's findings regarding Listing 1.04(C).  Therefore, the undersigned recommends the Court affirm the ALJ's Step Three determination.

**B.      Whether the ALJ Erred in Her Subjective Symptom Analysis**

McKissick argues, "The ALJ acknowledged Mr. McKissick's limitations on physical examination, as well as his ongoing complaints of severe pain, but appeared to dismiss them based upon isolated instances in the record of possible drug-seeking behavior and alleged non-compliance with treatment." (Doc. No. 17 at 17.)   McKissick asserts this dismissal fails to "constitute a proper evaluation" of McKissick's subjective symptoms.  (*Id.*)

The Commissioner responds that the ALJ "reasonably considered" McKissick's subjective symptoms and substantial evidence supports the ALJ's RFC.  (Doc. No. 18 at 9, 11.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human*

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the November 2, 2018 hearing.

[4] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016).

*Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, as McKissick admits (Doc. No. 17 at 17), the ALJ acknowledged McKissick's testimony and other statements regarding his physical symptoms and limitations. (Tr. 21-27.) The ALJ determined McKissick's medically determinable impairments could reasonably be expected to cause the alleged

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

symptoms.  (*Id.* at 21.)  However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id.*)  Specifically, after reviewing the relevant medical evidence, the ALJ found:

> Thus, while the claimant does have some functional limitations, his strength was almost always at least considered fair and was often considered good to normal in the bilateral lower extremities.  Therefore, the reduced range of light work in the above residual functional capacity fully accommodates the symptoms and limitations related to the claimant's back impairments.

(*Id.* at 24.)

Later in the RFC analysis, the ALJ further found as follows:

> Finally, the claimant's activities of daily living throughout the record are not consistent with physical or mental symptoms as intense, persistent, or limiting as alleged. July 2016 treatment notes reflect that the claimant was able to start a new job packing dog food, provided he had pain medication (Exhibit 6F/16). November 2016 primary care notes reflect that he was able to begin working in construction (Exhibit 6F/29). April 2017 treatment notes show that he was physically well enough to engage in a physical altercation (Exhibit 9F/2). An August 2017 report of contact suggests that he was able to do his own shopping and fixed easy meals (Exhibit 9E). September 2017 notes demonstrate that the claimant was able to perform odd jobs in lieu of payment at the boarding house where he lived (Exhibit 10F/5). At the hearing, the claimant testified that he is able to wash dishes and do laundry. He also noted that he spends his days watching movies and talking to his mother and sisters, and he knows to call 911 when he sees symptoms of his roommate's seizures. Thus, the claimant's activities of daily living do not support physical or mental symptoms as serve [sic] as alleged, and the level of functioning demonstrated in the activities of daily living are consistent with his restrictions in the above residual functional capacity.

> * * *

> In sum, the above residual functional capacity assessment is supported by the totality of the objective medical evidence of record, the claimant's subjective allegations, opinion evidence, and all other evidence in the record. Though the claimant reported significant back and right leg complaints throughout the record, he nevertheless generally maintained at least fair strength throughout the record with most of his treatment notes

> indicating that his strength was slightly reduced, yet still considered good,
> or normal. . . .

(*Id.* at 26-27.)

The Court finds substantial evidence supports the ALJ's assessment of McKissick's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with McKissick's allegations of disabling physical conditions. (*Id.* at 21-27.) Contrary to McKissick's allegations, the ALJ did not dismiss his subjective complaints "based upon isolated instances in the record of possible drug-seeking behavior and alleged non-compliance with treatment." (Doc. No. 17 at 17.) Rather, the ALJ credited some of McKissick's subjective symptoms but did not accept them to the extent alleged by McKissick because of his "at least fair" strength throughout the record and his daily activities, both of which are factors to be considered under the regulations. (Tr. 24, 26-27.) Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability. (*Id.* at 21-27.)

The ALJ referenced McKissick's allegations and then contrasted them with the medical evidence, including examination findings, as well as the opinion evidence. (*Id.*) Reading the decision as a whole, it is clear why the ALJ did not accept the entirety of McKissick's allegations. *See* SSR 16-3p, 2016 WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."). The Court is able to trace the path of the ALJ's reasoning regarding the ALJ's subjective symptom analysis. Therefore, the undersigned recommends the Court find no error in the ALJ's subjective symptom analysis.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: April 6, 2021                                   *s/ Jonathan Greenberg*
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).